[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a contested dissolution of a 23 year childless marriage. The parties intermarried on September 16, 1967 in Rockville, Connecticut and the plaintiff has resided continuously in the State of Connecticut for more than one year next before the date of the complaint. The parties separated on or about August 5, 1985 and the wife testified that the marriage had broken down as of October of 1985 though the defendant husband's testimony indicated that the marriage had broken down in either 1983 or 1984 or at least a year prior to the time of the separation. Regardless of when the marriage broke down, the parties had lived separate and apart for approximately five years at the time of the dissolution hearing.
It was the plaintiff's testimony that early on during the course of the marriage it was the parties intention that both of them should concentrate on the defendant husband's career and work CT Page 2408 to promote and advance him in his chosen career which was connected with data programming and/or computer technology. At the time of the marriage the defendant was working for Pratt Whitney Aircraft. This lasted for a short period of time and then he went to the Traveler's Insurance Company, a local insurer, in both instances doing data processing. In 1975 the husband transferred to Massachusetts Mutual Insurance Company in Springfield, Massachusetts as an assistant director of computer operations at $17,000 per year. By 1983 he had advanced to a second vice president still dealing with computer operations. He feels that without a college education he has probably reached the acme of his career. He is currently earning $87,000 per year.
Plaintiff further alleges that one of the reasons for wanting to advance her husband's career was so that she could eventually stay home and concentrate on having and raising a family. Her testimony, though, was that everytime she broached the subject of children with the defendant he was adamant in his opposition to having children at that particular time. Now at the time of dissolution the plaintiff is 43 years of age and feels that her biological clock has probably run and she no longer can achieve what she claims was her goal, that of having children and raising a family. During the course of the marriage the plaintiff held several different jobs mostly in the area of secretarial work but she never concentrated on the work with the intention of staying for any long period of time and making a career of her work efforts. Since the time of the separation she has become employed by American Optical Company as a detail person, which involves her traveling and visiting doctors of optometry, opticians and ophthalmologists to push American Optical products. She is currently earning in excess of $37,000 a year.
The defendant had several hobbies such as scuba diving, golfing and collecting wines. He also had a motorcycle which he enjoyed riding. Her sole hobby was in the areas of crafts. Also on Friday nights during the earlier part of the marriage, he played poker and further played racquet ball two to three times a week. The husband also enjoyed collecting or owning exotic type cars. At the time of the marriage he owned an MG Sports car which he eventually traded after the marriage to buy a Pontiac LeMans. During the course of the marriage he also owned a Pontiac Grand Prix, a 1967 MG, a Corvette, a Porsche, a Saab and currently a BMW. The only car she claims she owned during the marriage was a 1972 Pinto. Her testimony is further that he started to show signs of estrangement in 1983 or 1984. He became upset easily, yelled at her; he was volatile, he started drinking to excess and when he became angry he threw furniture around and one time pinned her to the wall and shook her and started complaining about the things that she was doing. Finally, in August of 1985 he called her from work one day and told her he wasn't coming CT Page 2409 home again. The only time he did come home was to pick up his personal belongings. It was sometime shortly after the separation that she learned that he was having a relationship of some sort with a Nancy D'Alessio. At the time of the separation the only thing that the defendant took with him besides his personal belongings such as his clothing was his Porsche. The car was in both names and at some subsequent time she demanded that he return the Porsche to her. She has had it in her possession up to the time of the dissolution.
Subsequent testimony on cross-examination and from the defendant and several of his witnesses indicated that there were a number of problems between the plaintiff and the defendant during the course of their marriage; that the plaintiff had the tendency to nag and if she didn't get her way or couldn't win an argument would become very petulant and on a number of occasions embarrassed the defendant in the presence of other people. One incident was when they were visiting up in Vermont and staying at a ski lodge. There was some argument while they were seated in the car and that she at some point left the car and walked back to the ski lodge. She was asked if she didn't jump out of the car and walk back to the ski lodge and she responded by saying, "no", that never happened. It eventually developed that the word "jumped" rather than "exited" or "left" the car was what she was hanging her response on and ultimately it came out that in fact she had left the car. This type of testimony based upon the semantics or the form which the questions took, had the tendency to create certain doubts relative to the plaintiff's credibility. There was an incident where she got into a shouting match with the defendant in Aruba and which she denied happened and yet two or three other witnesses testified to its happening.
One of the many problems that the trier had in this case was that the credibility of both the plaintiff and the defendant and a number of the defendant's witnesses was at best questionable. There were statements made in depositions which vary sharply from statements made at the time of the trial on the part of several witnesses and on the part of the defendant. But the more credible evidence ultimately seemed to come from the defendant's side of the case rather than the plaintiff's. A number of things that came about through examination of the defendant was that there was never any agreement that the parties would concentrate on pushing the defendant's career or that it was a goal of the marriage. It was also divulged through cross-examination of plaintiff herself that, in fact, the defendant never used any birth control methods at all and that all the birth control methods were used by her so that had she wanted a child at any time it would have been easy for her to dispense with the use of these birth control methods. The defendant himself testified that if she wanted a child at any time, all she had to do was CT Page 2410 go ahead and allow herself to become pregnant and that at no time did he ever state to her that he did not want children. There was also some questioning relative to a couple of the jobs that she had held which she ultimately admitted she was fired from. There was also some evidence relative to a couple of hospitalizations that she had had and what the nature of those hospitalizations were; whether or not there was some form of mental health problems and resulting depression. The plaintiff would have us believe that the problems were not caused by any mental health condition but as a result of inappropriately prescribed medication that she had been taking which acted adversely upon her. The thrust of the defendant's testimony and his witnesses testimony was that the plaintiff was a very difficult woman who insisted on having her own way and if she couldn't achieve this, she would act out irrationally and in an embarrassing manner on any number of occasions, and further that this was probably the major reason for the plaintiff eventually leaving and feeling that the marriage had broken down. His testimony was basically to the effect that the marriage had broken down well before he established even an acquaintanceship with Nancy D'Alessio. His acquaintanceship with Nancy developed as a result of their both being employees of the Mass. Mutual Insurance Company. She is also a vice president at Mass. Mutual. He denied any romantic or sexual relationship with Nancy until sometime subsequent to his leaving the marriage. However, at trial, he admitted that there was a sexual relationship which occurred within the same month as his leaving the plaintiff. He further claimed that he was originally dedicated to his marriage and that in spite of plaintiff's outbursts, of which there were four or five or six testified to during the course of the trial, that he loved her and that he stayed to try and make the marriage work. After listening to all the testimony and weighing in balance all the evidence, only some of which has been touched upon, this court is of the mind that both parties contributed to the breakdown of this marriage. The plaintiff testified that she probably contributed maybe up to 20% but in the eyes of the court they probably shared equally in the blame for the irretrievable breakdown that the court ultimately finds.
The difficulty in this dissolution is really centered upon the distribution of the assets and the granting of alimony, if any. The plaintiff's testimony is that she has no pension nor any kind of a thrift savings plan with her employer. It is her claim that her employer does not provide her with a pension and that it does not provide medical benefits nor disability benefits. On the other hand, the defendant has not only a pension he also has a thrift plan with his employer, he has some stocks and a bond (Nuveen) which gives him some small income. The trial did provide the court with some insight relative to the parties attitudes towards each other. The defendant at the time of CT Page 2411 separation paid his wife approximately $2,000 per month for 2 or 3 or 4 months. At some point, he cut this to $1,500 a month which he contributed over a period of two or three years. Approximately in March of 1989 the court did award the plaintiff alimony in the amount of $290.00 per week. The defendant has paid her on a monthly basis at the rate of $1,160.00 which actually resulted in some type of a shortfall to the plaintiff of approximately $76.67 per month from March 1989 until September 1990. However, it is interesting to note that over the five year period the defendant did pay to the plaintiff the sum of approximately $84,000, most of it as voluntary payments to her. During the course of the separation, it is also interesting to note, that the plaintiff on a number of occasions forged the defendant's signature to certain checks, cashed certain bonds that were in both names and forged his name to a tax return. She also forged his name to Nuveen bond dividends which she admits were really property that belonged to him. Further, defendant contributed to an IRA for the benefit of the plaintiff in the approximate amount of $10,000 during the period of their separation, increasing the IRA from $8,000 to $18,000 at the time of trial. The court feels that the defendant has been both fair and generous to the plaintiff during the five year period or at least up until the point that the court ordered alimony pendente lite and will take this into consideration in making its ultimate distribution and deciding on alimony.
After reviewing the testimony and the assets the court feels that the $250,000 figure testified to by the real estate appraiser is probably the correct figure to be applied to the value of the real estate in this particular case. Applying the $57,000 or $58,000 mortgage against that figure the parties will each have approximately $96,000 or $96,500 of equity. The court feels in all fairness that the plaintiff has lived there for the last five years by herself and it is her home and she should be able to keep same, so the court is going to order the defendant's share of the property be transfered to the plaintiff. Further, the plaintiff will keep her IRA which was made possible only through the generosity of her husband and the home furnishings. The defendant, on the other hand, will keep his IRA, will keep the Porsche which is really his love, not hers. The court believes she wants it only for spite, but it should be his wholly. Accordingly any interest she has in the car will be transferred to the husband. He should keep the 401K and his pension plan, the Nuveen bonds and whatever value there is in the insurance policies. They should all remain his exclusively. The court has considered the fact that the plaintiff will be taking the bulk of the estate because of the $96,500 value that she picks up from he husband and will take that into consideration in awarding alimony. Considering that the husband has paid over $80,000 to the plaintiff in alimony, plus the $18,000 IRA, he has been relatively CT Page 2412 generous to her and the court will consider this both in the distribution of the assets and any award of alimony to be made. The court is going to award alimony in the sum of $250.00 per week for one year, 200.00 per week for the second year, $175.00 per week for the third year and $150.00 per week for the fourth and fifth years subsequent to the date of the dissolution. These figures should be non-modifiable both as to term and amount and alimony will terminate at the end of the fifth year. This takes into account the fact that the defendant has already paid for approximately five years and the court does not see that alimony for more than a total of nine or ten years would have been awarded in any case. Considering the equity received in the home, the court feels that this is extremely fair to the plaintiff. The plaintiff has shown no ability to manage the money she has received from her husband over the past five years nor does she in any way account for it anywhere in her financial statement. With her income and this alimony she should be relatively well off down the line considering she will own the house outright. Despite the arguments made at the end of the trial, it is apparent to the trier that there is no proof that the defendant can advance any further in his job nor is there any substance to the fact that the plaintiff can't also advance further in her job. It is very possible that the defendant husband has reached the top of where he is able to go whereas that is not necessarily true of the plaintiff. Being new with the company, she has an ability to rise much higher in the area in which she is currently employed.
There also remains a small U.S. Savings bond. Since the bonds were originally joint and the plaintiff saw fit to cash most of the bonds, the remaining bond shall become the property of the defendant.
Accordingly, the court will find that the marriage of the parties has broken down irretrievably and will accordingly enter a decree dissolving the marriage and both parties will be free and single hereafter.
KLINE, J.